UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISA MIRSKY, | Hon. Dennis M. Cavanaugh |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 2:11-cv-02038 (DMC) (JBC) |
| HORIZON BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, | |
| Defendant. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon Plaintiff Lisa Mirsky's ("Mirsky" or "Plaintiff") Motion for Summary Judgment, (Pl.'s Mot. for Summ. J., Jan. 16, 2013, ECF No. 15), and Horizon Blue Cross and Blue Shield of New Jersey's ("Horizon" or "Defendant") Cross-Motion for Summary Judgment. (Def.'s Cross-Mot. for Summ. J., Feb. 19, 2013, ECF No. 17). Pursuant to Fed. R. Civ. P 78, no oral argument was heard. Based on the following and for the reasons expressed herein, Plaintiff's Motion for Summary Judgment is **granted** and Defendant's Cross-Motion for Summary Judgment is **denied**.

I. BACKGROUND[1]

On April 11, 2011, Plaintiff filed an action against Horizon to recover damages due under an employment benefit plan governed by the Employee Retirement Income Security Act

---
1 The facts set forth in this Opinion are taken from the parties' respective pleadings and moving papers.

("ERISA") of 1974, 29 U.S.C. §1001 et seq.. (Compl., April 11, 2011, ECF No. 1). Plaintiff was covered by a Horizon health insurance plan under a small employer group policy. Plaintiff was diagnosed with a serious bulimic eating disorder as well as post-traumatic stress disorder. In the months prior to her admission to inpatient care, Plaintiff binged and purged several times daily; was unable to engage in normal social relationships; and seriously considered suicide. Consequently, Plaintiff became unable to function in the workplace and was admitted to the Castlewood Treatment Center in Ballwin, MO ("Castlewood") on June 7, 2010.

Plaintiff's Horizon insurance plan (the "Plan") covered her initial treatment at Castlewood. Magellan Health Services ("Magellan") was designated by Horizon to administer Plaintiff's residential treatment. According to the Plan's Schedule of Covered services, Plaintiff's treatment at Castlewood was subject to pre-authorization by Magellan. The Plan defines "prior authorization" as:

> Authorization by Horizon for a Practitioner to provide specified treatment to Covered Persons. After Horizon gives this approval, Horizon gives the Practitioner a certification number. Benefits for services that are required to be, but are not, given Prior Authorization are subject to a reduction as described in the 'Utilization Review and Management' section of [the Plan]. (Def.'s Ex. C, 38).

Horizon approved reimbursement for Plaintiff's inpatient care until July 6, 2010. Thereafter, Horizon denied coverage for Plaintiff's continued residential treatment claiming such care was no longer "medically necessary" as Mirsky's condition could be effectively managed as an outpatient with partial care. Specifically, in a letter dated July 7, 2010, Magellan explained that Plaintiff's inpatient care was no longer "medically necessary" for the following reasons: (1) "There was insufficient evidence that member's disordered eating required 24-hour supervised treatment and intervention"; (2) "[t]here is no clinical evidence that would suggest member's

2

disordered eating could not respond to a lower level of care at this time"; (3) "[t]here is no indication that member's living environment could not provide the support and access to therapeutic services needed"; and (4) "[t]here is no indication that [Mirsky] has had weight loss or fluctuation of >10% in one month." (Def.'s Ex. E).

On July 8, 2010, pursuant to the Plan's "Appeals Process," Castlewood, on Plaintiff's behalf, filed a "First Level Appeal" of Magellan's decision to terminate benefits. On July, 9, 2010, Magellan upheld its denial of benefits, stating:

> [I]s not medically necessary based on 2010 Residential Eating Disorder, Adult Criteria due to the following reasons: (1) Magellan Medical Necessity Criteria, Residential Treatment, Eating Disorders are not met, (2) there is no reported evidence that [Mirsky] requires 24-hour medical/nursing intervention to avoid imminent serious harm due to medical consequences or avoid imminent serious complications to a medical or psychiatric condition as a result or significant weight loss or inability to maintain adequate weight, binging or purging, or resulting medical instability… and (3) there is no adequate evidence that the member's symptoms would not safely respond. (Def.'s Ex. F).

On July 12 2010, pursuant to the Plan, Castlewood requested a "Second Level Appeal. On July 13, 2010, the Appeal Subcommittee, comprised of Horizon Physicians, upheld the denial of authorization for continued residential treatment, finding such intensive treatment was medically unnecessary. (Def.'s Ex. G). Dissatisfied with Horizon's internal determinations, Mirsky requested, pursuant to the Plan, an "External Appeal with an Independent Utilization Review Organization (IURO) assigned by the Department of Banking and Insurance." (Def.'s Ex. C, 130). Permedion was appointed as the IURO. On August 24, 2012, Permedion upheld the denial of coverage on the following grounds:

> "[Mirsky's] condition has shown little if any change subsequent to that time and hence it appears that she was at or close to maximum benefit from this level of care as of July 7, 2010…There is no indication of acute risk to self or others and no indication of current physiological compromise as evidenced by the fact that


> her weight and vital signs are stable. She is not restricting, binging or purging. While she shows evidence of a need for ongoing treatment there is no indication that she could not be safely and effectively managed on an ambulatory basis.

(Def.'s Ex. H). Given that Plaintiff's residential treatment was no longer covered by Horizon, Mirsky's father, Dr. Robert Mirsky, paid more than $30,000 per month, from July 8, 2010 until December 14, 2010, to allow Plaintiff to continue her treatment at Castlewood.

As Plaintiff's denial of benefits had been affirmed at all three levels of Horizon's appeal process, Plaintiff sought relief from this Court and filed a Complaint seeking "compensatory damages, including all amounts spent to date for her residential care at Castlewood," as well as attorneys' fees, interest and costs. (Compl. ¶ 22(A)). On January 16, 2013, Plaintiff moved for Summary Judgment, arguing that Horizon's denial of benefits was unjustified because the medical evaluations by her treating physicians and therapists demonstrated residential treatment was medically necessary. (Pl.'s Mot. for Summ. J., ECF No. 15). In response, Horizon filed a Cross-Motion for Summary Judgment, arguing that its decision to deny Plaintiff residential treatment was fair, reasonable and appropriate. (Def.'s Cross Mot. for Summ. J. 2, ECF No. 17).

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); FED. R. CIV. P. 56(c). The moving party bears the burden of showing that there is no genuine issue of fact. Id. "The burden has two distinct components: an initial burden of production, which shifts to the non-moving party if satisfied by the moving party; and

an ultimate burden of persuasion, which always remains on the moving party." Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. Id. at 322; see also FED. R. CIV. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the non-moving party." Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000), aff'd, 51 Fed. App'x 76 (3d Cir. 2002) (citing Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).

### B. Standard of Review for Denial of Benefits Claim Under ERISA

The Primary issue before this Court is whether Horizon's decision to deny Plaintiff coverage for continued residential treatment at Castlewood was unlawful and unjustified. Before addressing the merits of this issue, the Court must first determine the appropriate standard of review to apply in an action brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B). As a preliminary matter, the Court must also establish the parameters of the administrative record in order to clarify which documents are properly under the Court's review.

A denial of a benefits claim brought pursuant to ERISA is typically reviewed under a *de novo* standard, "unless the plan grants discretionary authority to the administrator or fiduciary to determine eligibility for benefits or interpret the terms of the plan." Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where the plan grants the administrator discretionary

authority, the court reviews the administrator's exercise of that authority under an "arbitrary and capricious standard." Schwarzwaelder v. Merrill Lynch & Co., 606 F. Supp. 2d. 546, 557 (W.D. Pa. 2009) (citing Firestone, 489 U.S. at 115). To establish the appropriate standard of review, the Court must therefore examine the Plan and determine whether the administrator was granted discretionary authority.

The Plan at issue explicitly requires "prior authorization" before covered persons may receive residential care. (Def.'s. Ex. C, 45). Once treatment is authorized, as per the "Utilization Review and Management" section of the Plan, "Horizon [] has the right to conduct a continued stay review of any Inpatient Hospital Admission. To do this, Horizon [] may contact the Covered Person's Practitioner or Facility by phone or in writing." (Def.'s Ex. C, 99) The Plan's requirement that "prior authorization" be granted for certain services demonstrates that Horizon has discretionary authority to determine whether or not an insured individual is eligible to receive coverage for certain treatments. The fact that the Plan carves out a right for Horizon to conduct a "continued stay review of any inpatient hospital admission" also evidences that Horizon has discretionary authority to determine whether an individual is eligible for continued benefits during residential treatment. Because the Plan gives Horizon discretionary authority to preauthorize and review inpatient benefits, the Court finds the arbitrary and capricious standard of review is appropriate.

Under the arbitrary and capricious standard, "an administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (quoting Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)); See also Orvosh v. Program of Grp. Ins.

for Salaried Emples. of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000) ("[A] plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan.").

### C. Scope of the Administrative Record

To determine whether the administrator's decision is "without reason, unsupported by the evidence, or erroneous as a matter of law," the Court must "look to the record as a whole," which "consists of that evidence that was before the administrator when he made the decision being reviewed." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d. Cir. 1997). The parties dispute what constitutes the "whole" record. Horizon argues that the documents submitted by Plaintiff to Permedion as part of the external review should not be considered by the Court because they were not considered by Horizon in the decision-making process. Plaintiff and this Court disagree with Horizon's contention.

The language of the Plan defines Horizon's appeals process to consist of three levels of review. The final round of appeal, though conducted by an external body, is part of Horizon's clearly articulated review process. As noted by the Third Circuit Court of Appeals the focus of the review is the "plan administrator's *final*, post-appeal decision." Funk v. CIGNA Group Ins., 648 F.3d 182, 191 n. 11 (3d. Cir. 2011) (emphasis added). Third Circuit precedent as well as common sense dictate that the Court should review the final denial of Plaintiff's benefits. Accordingly, the Court finds that the physician reports submitted to Permedion as part of the final appeal process are part of the administrative record. The Court also notes that the scope of its review is not strictly limited to the final appeal decision by Permedion. The Court may "consider prior decisions 'as evidence of the decision-making process that yielded the final
7

decision.'" (Kelly v. Reliance Std. Life Ins. Co., Civ. No. 09-2478, *13-4, 2011 U.S. Dist. LEXIS 147133 (D.N.J. Dec. 21, 2011) (citing Miller, 632 F.3d at 855-56).

### III. **DISCUSSION**

The Court must now examine the administrative record and determine whether Horizon's decision to deny Plaintiff coverage for continued residential treatment at Castlewood was unreasonable, unsupported by evidence or erroneous as a matter of law. Under the Plan, to establish that Mirsky's residential treatment was medically necessary, she was required to satisfy "A, B, C, and D or E" of the following "Criteria for Continued Stay:"

- A. Despite reasonable therapeutic efforts, clinical evidence indicated at least one of the following
    - the persistence of problems that caused the admission to a degree that continues to meet the admission criteria (both severity of need and intensity of service needs); or
    - the emergence of additional problems that meet the admission criteria (both severity of need and intensity of service needs), or
    - that disposition planning, progressive increases in hospital privileges and/or attempts at therapeutic re-entry into the community have resulted in, or would result in exacerbation of the eating disorder to the degree that would necessitate continued residential treatment.
    - A severe reaction to medication or need for further monitoring and adjustment of dosage in an inpatient setting, documented in daily progress notes by a physician.
- B. The current treatment plan includes documentation of diagnosis (DSM-IV axes I-V), individualized goals of treatment, treatment modalities needed and provided on a 24-hour basis, discharge planning, and intensive family therapeutic involvement occurring several time per week (unless there is an identified valid reason why such a plan is not clinically appropriate or feasible). This plan receives regular review and revision that includes ongoing plans for timely access to treatment resources that will meet the patient's post-hospitalization needs.
- C. The current or revised treatment plan can be reasonably expected to bring about significant improvement in the problems meeting criterion IIIA/ this evolving clinical status is documented by a daily progress notes, one of which evidences a daily examination by the psychiatrist.
- D. The patient's weight remains <86% of IBW and he/she fails to achieve a reasonable and expected weight gain despite provision of adequate caloric intake.
- E. There is a continued inability to adhere to a meal plan and maintain control over

> urges to binge/urge such that continued supervision during and after meals and
> or/or in bathrooms is required. In order to satisfy this criterion, there must be
> evidence that the patient is unable to participate in ambulatory or residential
> treatment.
>
> (Def.'s Ex. G, 3-4).

Criterion "A" essentially requires that the patient's problems are still severe enough to meet the requirements of admission or that reentry into the community would result in relapse. Horizon argues that Plaintiff does not meet Criterion "A" because she was "completing her meal plan, not purging, and even self portioning out food." (Def.'s Opp. 22). In contrast, Plaintiff argues that she satisfied the severity prong under Criterion "A" because all of her therapists and physicians agreed "that attempting to plan therapeutic re-entry into the community at the time benefits were denied would exacerbate her eating disorder and quickly cause [Mirsky] to spiral out of control to the point where readmission and continued residential care would be necessary." (Pl's. Br. 13-14).

Contrary to Horizon's assertion that Plaintiff's progress demonstrated that inpatient care was no longer medically necessary, all of Plaintiff's therapists and physicians unanimously agreed that she was not mentally fit to return to the community as an outpatient. For instance, Dr. Schwartz, the Clinical Director at Castlewood, stated that "Mirsky needs to get her bulimia under control…to prevent certain relapse if she is returned to outpatient prematurely." (Pl.'s Ex. O). Likewise, Dr. Jurec, the staff psychiatrist at Castlewood who cared for Mirsky from the time of her admission on June 7, 2010, stressed that "at this time it is against medical advice for this patient to be in a lower level of care." (Pl.'s Ex. P). Additionally, Dr. Asher, an independent medical reviewer, stated "it is my medical opinion that [Mirsky's] bulimia, depression and post-traumatic stress disorder combine to form a life threatening complex that

9

must be treated for at least 8 more weeks at the residential level of intensity; the risk of not treating at this level of intensity is clinical deterioration and even suicide." (Pl.'s Ex. E). Based on the evidence establishing the severity of Mirsky's mental illness, the Court finds that Plaintiff meets Criterion "A" of the Continued Stay Criteria.

Criterion "B" requires that the patient's current treatment plan be regularly reviewed and revised and include documentation of diagnosis, individualized goals, discharge planning, and family therapeutic involvement if appropriate or feasible. The administrative notes and conclusions of Plaintiff's Physicians demonstrate that Castlewood was setting clinical goals for Plaintiff's treatment and working toward an eventual "step-down" level of partial care. Dr. Jurek noted that Castlewood intended to transition Mirsky to a specific step-down level of partial care "as soon as [Mirsky] is capable of autonomously maintaining adequate nutrition without binging and purging and her anxiety and trauma are stabilized enough for her to manage without a 24-hour inpatient residential structure." (Pl. Ex. P). Dr. Schwartz and Gerber wrote, "[Mirsky] needs to get her bulimia under control and then have periodic exposure and practice in our Step Down PHP to prevent certain relapse if she is returned to outpatient prematurely. (Pl.'s Br. 15-16). The administrative notes also evidence that a treatment plan with individualized goals was in place and family involvement was determined to be inappropriate at the time Plaintiff's benefits were denied.[2] The administrative record therefore shows that Castlewood was implementing a treatment plan for Plaintiff that clearly met Criterion "B."

Criterion "C" requires that the treatment plan be reasonably expected to bring about

---

[2] The administrative notes state: "start to self-portion dinner daily as of 7/6/10 and after one week start to self-portion breakfast on 7/12/10, then as of 7/1/10 every Thursday there is a buffet line to self-serve with staff, she will start portioning start 7/2/10." and "[n]o family sessions until they come face to face on 7/12/10 because [patient] is not ready." (Pl.'s Br. 16).

10

significant improvement in the problems that caused admission. Mirsky argues that the entire purpose of the inpatient treatment was "centered around attacking the eating disorder directly to try and suppress the binging and purging cycle while at the same time offering a therapeutic approach to the root causes, which...included post-traumatic stress disorder, high levels of anxiety mixed with depression, and other emotional traumas." (Pls. Br. 16-17). Given the numerous physicians reports indicating that Plaintiff could only successfully and safely address the root causes of her illness through further inpatient treatment,[3] the Court finds no evidence to support a conclusion that Plaintiff's treatment plan was not reasonably expected to bring about significant improvement to the underlying psychological problems that precipitated her admission to Castlewood. As such, Plaintiff fulfills Criterion "C."

The Criteria for Continued Stay require that Plaintiff meet "D" or "E," not both. Criterion "D" requires that the patient's weight remains <86% of Ideal Body Weight (IBW). It is uncontested that Plaintiff's weight was greater than 86% of her IBM and therefore she does not meet this criterion. Plaintiff points out that Horizon's use of this Criterion to deny Plaintiff's Continued Stay is arbitrary and capricious because Horizon had not previously considered Plaintiff's IBW each time it approved inpatient treatment leading up to July 7, 2010. (Pl's. Reply 10). The Court agrees that the use of this factor as a basis to deny further inpatient treatment is arbitrary given it was not considered by Horizon in prior approvals of Plaintiff's

---

[3] Dr. Jurec writes that "[Mirsky] has had frequent panic attacks which had to be managed by staff with hours of behavioral interventions...her intensive individual psychotherapy resulted in recall of traumatic memories and events and activated her post-traumatic stress disorder and high anxiety states...based on my assessment this patient needs to be in a residential level of care to deal with these comorbid problems. Additionally, Dr. Schwartz and Gerber agree with Dr. Jurec writing, "[Mirsky] requires a highly structured environment to stabilize her trauma, normalize her eating...and stabilize her mood and high anxiety...her present level of impairment makes her unsuitable for any lower level of care...we could and would not attempt this type of intensive traumatic treatment in a lower level of care. (Pls. Br. 17; Ex O & P).

11

residential treatment. However, Horizon's application of Criterion "D" is not determinative as it is not a required factor. As long as Plaintiff meets Criterion "E," she would still meet the requirements for a Continued Stay.

Criterion "E" requires that the patient be unable to adhere to a meal plan and maintain control over urges to binge/purge to the extent that continued supervision is required. Horizon claims Plaintiff does not meet this requirement because she was completing her meal plan and had not actually binged or purged since June 11, 2010. (Def.'s Opp. 23). Mirsky argues that the administrative notes and the physicians' letters demonstrate that although Mirsky may not have been actually binging and purging, she was struggling to control her urges to binge and purge at the time her benefits were denied. Plaintiff also points out that the only reason she was not actually binging and purging was because she was being monitored 24 hours a day and all the refrigerators, cabinets and bathrooms were locked." (Pl.'s Reply 10).

The Court agrees with Plaintiff that Horizon incorrectly applied this factor. Criterion "E" does not focus on whether the patient is simply restricting, binging, or purging, but rather on whether the patient is able to maintain control of restricting, binging, and purging without continued supervision. The Court disagrees with Horizon's contention that Mirsky was successfully adhering to her meal plan as the administrative notes clearly establish that Mirsky had significant difficulties self portioning her meals on July 12, 2010.[4] (Def. Ex. D, 22). Based on the administrative record, the Court finds that at the time her benefits were denied, Mirsky continued to struggle with her binging and purging to the extent that she required

---

4 The administrative notes of July 12, 2010 state: "[Mirsky] has extremely high urges and purges...Unable to self portion her meals...Extreme anxiety and panic attacks...Needs containment skills. Her urges are so intense she needs 24 hour supervision so she does not act out on behavior and working on truma [sic] prevention..." (Def. Ex. D., 22).

constant supervision. As such, Plaintiff meets Criterion "E" of the Continued Stay Criteria.

The Court now looks specifically to the decision of the final appeals board made by Permedion on August 24, 2010. The Court notes that in Permedion's letter affirming the denial of benefits, there is no mention of the Criteria for Continued Stay. Instead, there is simply a paragraph entitled "Reviewers Findings" which provides the basis for Permedion's decision. (Def.'s Ex. H). The fact that the criteria that are articulated in the Plan and that were used to justify the denial of benefits during the first two rounds of appeal are absent in the final appeal decision strikes of arbitrariness and demonstrates a failure "to comply with the procedures required by the plan." See Orvosh, 222 F.3d at 129.

Permedion's first justification for upholding the denial of benefits is that Plaintiff "has shown little if any change" subsequent to July 7, 2010 and therefore "was at or close to maximum benefit from this level of care" at the time of the denial. (Def.'s Ex. H). Permedion also notes that Plaintiff's "weight and vital signs are stable." Id. First, it is unreasonable for the review board to consider Plaintiff's status subsequent to July 7, 2010 in order to determine whether her denial on that date was appropriate. Additionally, it is without reason to conclude that Plaintiff's minimal physical change was a result of her receiving maximum benefit from her inpatient treatment. This conclusion is not supported by the evidence in the record. Instead, as the physicians' statements show, Plaintiff's weight had stabilized because her actions and access to food were being constantly monitored. As the administrative record makes clear, Plaintiff's underlying psychological issues were still far from stabilized. (See Pl.'s Ex. E, F, I, J, N, O, P)

Permedion also sustains the benefit denial on the grounds that Plaintiff has a psychiatrist and therapist in New York "where she could receive follow up" and that there is "no indication

of acute risk to self." (Def.'s Ex. H). Permedion's determination that Plaintiff could be successfully treated at home by her local doctors is unsupported by the numerous physicians' reports, including that of Dr. Jurec, that conclude Plaintiff was "unsuitable for any lower level of care." (Pl.'s Ex. P). The finding that there was no "acute risk to self" is also unsupported by the evidence as reports by treating physicians indicated Plaintiff was at risk of clinical deterioration, relapse or even suicide. (See Pl.'s Ex. E, J).

Finally, Permedion justifies the denial because Plaintiff was not "binging or purging" at the time. This issue is analogous to our discussion of Criterion "E" above. If Permedion is applying this factor, it is applying it incorrectly as this Court discussed earlier. The administrative record demonstrates that Plaintiff was still struggling to maintain her urges to binge and purge and was only controlling them because she was under constant supervision. As such it was unreasonable to deny Plaintiff's further residential treatment on this basis.

The Court finds that Horizon's denial of Plaintiff's benefits for continued residential treatment was arbitrary and capricious on a number of grounds. First, the administrative record demonstrates Plaintiff met the Criteria for a Continued Stay under the Plan and that her continued residential treatment was medically necessary. Therefore to deny coverage for this treatment was unreasonable. Second, the decision by the final appeals board (Permedion) makes no reference to Horizon's Criteria for a Continued Stay which shows a failure to comply with procedures required by the Plan. Finally, Permedion's decision fails to address the conclusions of Mirsky's treating physicians and is clearly not supported by the evidence in the record.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **granted** and Horizon's Cross-Motion for Summary Judgment is **denied**. An appropriate Order accompanies this opinion.

Dennis M. Cavanaugh, U.S.D.J.

cc: Hon. James B. Clark
    Counsel of Record
    File